If you are arguing on behalf of an appellant, can you just let us know how much time you've reserved? The clerk may call the first case. Case number 14-1029, J.D.D. v. Township of Clinton. Rural argument on District 15 minutes presiding. Ms. Victor, will you be the appellant? If I may, I would like to reserve five minutes for rebuttal. Thank you. May it please the Court, I'm Cindy Rhodes-Victor. I represent the appellants. This case has two elements to it. One is the statute of limitations. One is the substantive claims. Turning first to the statute of limitations, we submit to this Court that the District Court erred in its determination that the case was barred by statute of limitations because the District Court relied on a report that was dated in 2009. But there was no disclosure of it or any information to appellants that that report existed until sometime thereafter. Isn't it part of your theory that your client believed all the way back to, I think, 1999 that he was being targeted? He believed back that far but did not know. It's one of those situations where he kept hoping things would get better. But the straw that broke the camel's back was being named as a criminal suspect. And for a man who's never had, doesn't have any drug problems, doesn't even smoke a cigarette as a member of our armed forces, a member of the Coast Guard, as you can see, he's here in his uniform today. This was hugely upsetting to him, more than just all of the other abuses he had taken over the years. This was the last straw. Let's focus for a moment, just say, on the parking lot patrols, which you say were excessive and he was targeted for those. I mean, if those are going on for 10 years, shouldn't he be charged with that knowledge and not have 2009, 10 years later, be the date where he's deemed to be aware of that unfair enforcement? He had knowledge of the parking lot, and that's where we get into the continuing violation theories. Because while he had knowledge of the increasing level of parking lot surveillance, that did not get, it became more and more and more and more. Until you get to the point of 2009, 2010, 2011, the lawsuits filed in 2012, and then it magically stops. And you don't have any runs in 12, you don't have any runs in 13. Which are unusual in the comparison to what happened. If this was such a terrible place, with such endemic problems, why after the filing of the lawsuit does it magically disappear? So yes, while there were things that we believe support the continuing violations theory, it didn't all coalesce until the time of this false police report. And when he learned of the false police report is when, in 2010, and then the patrolling became even more greater and more greater and greater. Even if the court were to say, okay, you know, here's the point to bar the entire lawsuit for things that happened after 2009. I mean, it's unrebutted that he didn't learn of any of the police activity until 2010 when Ms. Bolling was arrested. And the case in which the district court relied on, I'm sorry, this court has ruled in Cooey v. Strickland, as we mentioned in our brief, 479 F. 3rd 412, which decided in 2007, 1983 actions are best characterized as tort actions and a claim accrues when an event occurs that should have alerted a person to protect his rights. He would not have known about this police report. He could not have known in 2009. In fact, the testimony from Officer Gerling made clear that this was a confidential investigation. There was no information. There was nothing out there. He only learned of it when Ms. Bolling was arrested and then began to do things to protect his rights, to find out information, to get further information, even at the time of this case when we were taking depositions. There were things that were not disclosed, the supposed name of the informant and things like that. So it was not possible for him to have done anything earlier. If he had sued in 2004, if he had sued in 2005, it wouldn't have related to this instance. Who knows what would have happened, but at that point they would have said, well, it's not large enough. It's not enough instances. I think what it shows from 1999 forward is you have, as we show in our continuing violation, a pattern of continuing discrimination and selective enforcement toward the appellants, the individual and the businesses that just come to a crescendo with the increased policing in the last few years before the complaints filed. Let's take a look at the evidence that you have for the targeted excessive enforcement. It seems like all that you have for the proposition that the police patrolled the bar more than other bars was the deposition testimony of Bolling. Is that fair? No, I wouldn't say that that was fair because as we lay out in our statement of facts in the appellate brief, what we did was, in the absence of getting documents or any discovery, is we went through all the MLCC reports for all of the other businesses to show how many times other businesses in the area had been reported. It's significantly less than ours. How many other runs there were? Significantly less than Crescent Jacks. But they say at least 100 of these runs were initiated by somebody calling from the bar. There were only two that were calling from the bar, and that's the evidence that we put in our statement of facts and we refer it to the record. None of that is supported by any evidence, which we had pointed out in our reply brief. In the parking lot, as we lay out in page 11 of our statement of facts, the parking lot has Cracker Jacks in the front, but it's a large parking lot that's got other businesses, including Value World, which is a very low income thrift store type place. So it's got lots of other businesses that could bring in a different type of element. But all of the efforts, while in the other parts of the parking lot these things are going on, the cars are being parked at Cracker Jack. So they're not even tying in something that happens over by Value World to Cracker Jacks, but they're putting the police cars there. So, no, we would say that it's the evidence, both the affidavit of Mr. Gladstone and his deposition testimony, both of which are rebutted, and Ms. Bolling's testimony, which was not rebutted, the 180 reports. I thought Ms. Bolling's testimony was conclusory. I mean, is that a fair characterization? I mean, she basically just says they came to our bar much more than other bars, period. She says that statement, but she says it isn't challenged how do you know that or where would you come from. It comes from, as she says in the beginning part of her deposition, she had reason to, she talked to these police officers several times. They brought her into a van. They said, give us dirt on Skip Gladstone. They did all these things, and she had personal experience with other establishments to know that they were picking on this one. I think her testimony is very telling about how the focus of all of this was not really her, but it was Mr. Gladstone and some of the things that were being done. She, I think, was very eloquent about being put into a van and having pictures of her family there and being told, if you give us information about Mr. Gladstone, we'll do things. So just not normal, ordinary type of arresting situations that would come about if there were indeed a legitimate situation. And as we point out in the brief, it continues. It didn't just stop. It continued on. It, to this day, has issues. Let me ask you a slightly different question. Because of the statute of limitations issue and whatnot, there are other issues that probably didn't get as fleshed out as they might have if that hadn't been involved in the case. But the only defendant in this case is the township of Clinton. And since there's no respondeat superior liability under 1983, your theory either had to be that the township had a customer practice or sort of a Pembauer versus Cincinnati theory that there was an official that in effect spoke for the unit and so forth and so on. It isn't clear to me which horse you're riding and what support do you have for either one. Thank you, Judge Guy. We rely, I want to say both, but that's really a silly way to say it. We believe that here we have identified an individual who spoke, Captain Franey, who spoke for the township by orchestrating and detecting these things to fit into the Pembauer versus city of Cincinnati situation. We also say, though, overall that as part of the information that we put forth in our continuing violation information is that there was a longstanding practice of discrimination against appellants in this case. But the prosecutor in Pembauer, for example, is clearly in charge of a unit of government. In fact, I think they're even elected. They may even be elected. And you're looking at somebody who isn't even the head of the department. Correct, but he was able to have enough influence to create this. I mean, the facts themselves when compared to other people create a situation where we have, as the court has held in other cases, you can have even one instance at times being enough to justify a 1983 action. Here you have a situation where you've got the power of the township being used and the township, you have Officer Gerling, you have all the way up to the Chief Poscovitz being part of the plan to execute this custom and practice of discrimination. There's no one who comes forward and says, we disavowed, this was a rogue officer, he shouldn't have done this, it was improper, this is not how the township normally acts. There's not ever been that argument in this case. It's always been, no, we did this, this was adopted by the township and we've done this properly. I just had a question on the Liquor Commission reports. As I was trying to add up the number, it looks like if we look at the five-year period, there were about 22 of the reports. But isn't it right that only two of those involved Cracker Jacks and that there are other, you know, for this comparative purpose, I think for the 10 fish there were five. Tell me how the Liquor Commission reports helps make your case if other establishments had more claims against you. Actually, we had the most claims. There were nine that were filed against our establishment. And there were less for other establishments. There are 40-some Class C liquor license establishments in Clinton Township. My understanding was you only had two liquor license violations. No, there were more than that. Can you give us a record where you get nine? Or if you have to look for it, you could let us know. I can do it during rebuttal. Yes. That would be perfect. I can do that. Thanks. Thank you. Thank you. We'll hear from the township. Thank you. Good morning. Rachel Bedelmenti on behalf of the township. I think that Judge Guy pointed out an important facet of the case, and that is that this is a case against Clinton Township. There needs to be an official policy or custom that's alleged before we even get to the statute of limitations question. The reality is that there is no official policy or custom that's been pled or proven in this case. The idea is that they were out patrolling more often than normal, but there is no indication that that was a policy of someone or that that was how the officers in Clinton Township were directed to patrol Cracker Jacks. Or was it just a coincidence that, you know, presumably a bunch of different officers all happened to do this, allegedly, you know, for a 10-year period or whatever? The allegation at the time that we filed our motion for summary disposition became that there was some sort of a romantic relationship between somebody at the police department. And I think it's very important that that came out there at the end because what we learned is that Mr. Franey, the officer who supposedly had this disagreement or dual relationship with the appellants, he was gone from the police department. He retired. In 2007, Chief Possevitz became the chief of the Clinton Township Police Department. He testified that he was involved. He was the liaison between the Michigan Laker Control Commission and the Clinton Township Police Department. So he was the one that decided what was going to be reported and what wasn't going to be reported. It didn't have anything to do with Mr. Franey. Furthermore, he became the chief in 2007. So any acts that happen, even if we accept as true the proposition that Franey was involved somehow in directing something, they were done by 2007. And that is unequivocal testimony from Chief Possevitz and Sergeant Gerling. There is absolutely nothing, including the plaintiff's own testimony, I'm sorry, the appellant's own testimony, that disputes that or refutes that. In fact, he testified that he doesn't know if his establishment was patrolled more often than others. He just thinks so. Well, what about the fact that you didn't produce Mr. Franey or Officer Franey for deposition? I mean, you were sending him pension checks or something. How in the world was he not produced? That is an extraordinarily inappropriate assertion on the part of the appellants. And I can tell you that we offered to produce Mr. Franey. We offered to do it in Florida. We offered to bring him here because he visited Michigan for the summer. We were working on coordinating a schedule, and the issue died. There was no deposition notice sent. Okay, they just didn't respond. Discovery then closed. There was no request to reopen it and set the deposition. There was no deposition notice. There was no motion to compel us. It is inappropriate now to say that there was some more discovery that should have been done that we didn't permit if you didn't file a motion to compel. You didn't do anything, and the reality is we were offering. I thought your response was that you didn't know where he resided or something. No, we did not know initially where he resided. It took us about a month to get a good address for him. We advised counsel about that address. We have a number of cases together. Where in the record is your advising counsel of the address and the location? I can tell you that it is in our lower court briefs. Where is your documentary response to the plaintiff of his address? I doubt that there is a document that we submitted. I doubt that we submitted any letter on the record. So you didn't send a letter with his address or an e-mail with his address? We often do communicate by e-mail. Our offices, I couldn't tell you sitting here today that we did do that as opposed to talking on the phone. But I can tell you that there was no affirmative action taken by the plaintiff while this case was pending to require the deposition. Did they notice his deposition? Never. They never sent a notice for his deposition. We indicated that we would produce him in Florida immediately or we would produce him in Michigan in the summertime. There was not a formal notice ever? There was no request. There was no formal request. There was no formal motion. And so to say now that we did not allow the deposition of Mr. Franey is inappropriate. The reality is that it wouldn't have helped their case to depose Mr. Franey. It helps their case more to say they didn't give us Mr. Franey. And so that is the reason, in my opinion, that the deposition was not noticed and that the deposition was not taken. And furthermore, Chief Posovitz is the chief in 2007. So we have this time frame where supposedly the statute of limitations isn't going to apply because bad acts begin in 1999 and they end in 2009. But Chief Posovitz is involved from 2000 and becomes the chief in 2007. So he certainly knows the workings of the MLCC reporting in 2000, and he certainly knows the workings of the entire department by 2007 when he becomes the chief. Is it your position that everything that is claimed to be discriminatory is a discreet act? It is my position. So if someone actually had had a policy of excessive or more than other individual businesses' surveillance or presence in the parking lot, you would say that it is a discreet act each time a police officer drives into that parking lot and sits down? That's exactly where I was going. So if Franey was involved, was where I was going, his involvement ended by at least 2007. No, but that's not my question. My question is how is it a discreet act if a police officer comes by a business one time? I don't understand how you would say, well, this is one discreet act, that's a cause of action. But if a police officer comes by a business ten times a day for 365 days, don't you have how these cases are often treated much like a hostile work environment? It's not the discreet act that creates the cause of action. It's the continuation of a pattern of actions that creates a discriminatory impact, isn't it? I would agree with you with that analysis. However, in this case, what is being alleged and what the plaintiff or appellant specifically testified as to being alleged and what the record shows is that over a period of about ten years, there were 182 police responses to this location. Of those, nearly every single one involved a call from a patron or an employee of Cracker Jack's to come to assist, to request for police assistance. And what the trial district court recognized is that the Clinton Township Police Department isn't out there 365 days. There's no evidence that they're out there discriminatorily monitoring or patrolling this location. The evidence shows that they're out there in response to a police call for assistance. Well, the documentary evidence for the documented response is to calls, but you have at least two witnesses that have testified that officers came on a daily and routine basis several times a day throughout this time period. So that's evidence, isn't it? Actually, I would take issue with that. Ms. Bowling testified that there were police oftentimes at the location. Her testimony was that there were a lot of fights that went on at the Cracker Jack's, and there was a lot of underage drinking that was being monitored at all of the establishments in Clinton Township. In fact, there were sting operations that went to multiple bars in Clinton Township on the same night. And so there was police presence in Cracker Jack's, according to Lucretia Bowling, in response to calls. She testified that it was either a minor in possession investigation or that it was in response to a call. There were a lot of fights. There were police out there all the time because of what was going on with the patrons at Cracker Jack's. In fact, the appellant's own brief in this case indicates that the parking lot was a problem, and their position is, but the parking lot wasn't all Cracker Jack's parking lot. The parking lot was also the value land behind it, and that people would ‑‑ Maybe there was some re-judgment, luckily. Right. So there's a question whether there is a dispute of material fact? I don't think that there is. The only dispute of material fact is the plaintiff's unsubstantiated, unsupported claim that he thinks that he was patrolled more often than other Class C liquor establishments. There is no evidence that that is the case. The evidence in the case indicates that the Clinton Township Police Department acted properly, acted in accordance with how it patrolled other Class C establishments. That is undisputed. It's testified to by Chief Posovitz. It's testified to by Sergeant Gerling. And the only thing that plaintiff says is that he thinks it to be otherwise, but he doesn't know. He has absolutely no indication and no support for the theory that Cabo Wabos or Slapsticks was patrolled any differently. He has no indication that police officers didn't drive past those establishments and make sure that there weren't drunk drivers leaving the parking lot of those establishments, too. To show discriminatory conduct, he has to show that someone else similarly situated to him is being treated differently. What he has is a claim that he thinks that the Clinton Township Police Department shouldn't have been at his place as much, but he doesn't have any evidence that he was treated differently than any other Class C establishment. And that's why his argument fails in this case. That's why he fails to establish a genuine issue of fact. And that's why the district court dismissed, because it's not a matter of whether or not police were at his establishment. It's a matter of whether he was treated differently than other Class C establishments. And the evidence is that he wasn't. And it's undisputed evidence. His own testimony, and we cited in our brief, is, I don't know. I don't know if they were treated differently. I suspect that the police were out at all the different bars and making sure that drunk drivers weren't leaving the parking lots at various times. He knew that minor possession sting operations would go from bar to bar to bar on a particular night. So to that end, he knew that he was being treated the same. And it comes down to then this 2009 investigation, which I think is important that it's now the focus of the appellant, because the 2009 investigation is an investigation of him. It begins as an investigation of him. You have no liberty or property interest in being free from being the target of an investigation when you are identified as someone that will sell cocaine inside of a liquor establishment as the owner. You have no liberty or property right to be free, and you have no selective enforcement claim, and you have no 1983 claim to be free from being the target of a follow-up investigation when a confidential informant makes that report. The fact that the confidential informant made that report is undisputed. The fact that the confidential informant was credible is undisputed. And the fact that there was follow-up, and when Mr. Gladstone, the appellant, was not found to be the distributor after the first buy, his name is taken off of the report, suggests that there is no discriminatory conduct, and certainly doesn't give rise to a 1983 or liberty or property interest claim. The fact is that the appellant was suspected of doing something. An investigation occurred, which is the Clinton Township Police Department's job to do, when he wasn't identified during the first of four buys at this liquor establishment of crack cocaine from the head bartender. His name is taken off the reports, and the focus shifts to somebody else, appropriately. But you're in agreement that he would not have known that his name was in the report until January of 2010? I would agree with that. I would agree that he would not have known, but I would submit that it doesn't matter. Because in order to add that to the selective enforcement series of events that supposedly give rise to this claim, that 2009-2010 event has to involve some violation of a constitutional right. It has to involve some selective enforcement of the laws. And the reality is, it doesn't. It involves a confidential informant making a report and the Clinton Township Police Department following up on it. In fact, Sergeant Gerling had no prior knowledge of, had not been involved with, had not had anything to do with Mr. Gladstone prior to getting that information from his confidential informant and following up on it. So I would submit you're correct, Judge, that probably he didn't know. But it doesn't matter, because that doesn't tie on to the string of the supposedly other selective enforcement claims. If there are police patrolling excessively or making stops and arrests, those issues would be separate from this one because those issues arguably involve some discriminatory conduct. In this situation, in the 2009 situation, there's absolutely no evidence of any discriminatory conduct. In fact, there is no indication at all in this record or anywhere that anybody from the Clinton Township Police Department had received similar information from a confidential informant or otherwise about some other liquor establishment and not followed up. And so it's important here. Even if it got him over the statute of limitations, your argument is a merits argument. Right. He would lose anyway. He would lose anyway. And it's twofold, because we're not talking about Sergeant Gerling. We're talking about the Clinton Township Police Department. So we have to be able to show, with respect to that 2009-2010 investigation, we have to meet the Munell standard. We have to be able to show under Munell that we have some policy or custom, official policy or custom, that caused a constitutional deprivation. That official policy or custom would be we are going to investigate information about drug buys at a bar that are given to us by a confidential informant, but we're only going to investigate them as to Mr. Gladstone and not as to the bar next door. There is absolutely no indication that that was the case, and, in fact, the record evidence wholly refutes such an allegation. So it's important that we distinguish the fact, and Appellant has now relied on that as really the hinging factor of their claim. And it's very important because, number one, there's no liberty or property interest in being free from being a suspect in an investigation, as long as that investigation is conducted properly, and it was, and there's no dispute of that. And number two, this is a Munell case. This isn't about Sergeant Gerling and whether he should have done something different with the information that he got. The question under Munell is whether there's an official policy or custom, and there is not in this case. For that reason, we submit that that summary judgment was properly granted, and we ask that it be affirmed. Any further questions? Thank you for your argument. Thank you. We'll hear from Ms. Victor. Hello, Your Honor. To answer your question before I sat down about the nine police reports, it's on page 19 of our reply brief. The record is R19-25, page ID 509-510. They were reported nine different times from 1999 forward, and the dates and so forth are in the first paragraph and then at those docket numbers. In fact, looking at the docket evidence, it actually shows that much of, with all due respect to sister counsel, much of what was said is not supported by the record. With respect to the Franey matter, we actually did send a notice of deposition. That's why the day before the deposition, we received a letter from them saying they're not going to produce him the next day because they didn't know where he was. That letter is in the record before the court, R19-22, page ID 499-501. Did you notice his deposition? Yes, absolutely. We sent a notice for his deposition. Was that notice in the record? Yes, that's the record notice that I just gave you. Then just prior to the deposition, that's the notice that I just read you, which was page ID number 499-501. Then the day before the deposition, at R19-23, page ID 503, they sent us letters saying we can't produce him for his deposition because we're trying to ascertain his address. We don't know where he is. There isn't anything that says they knew where he was or that he was in Florida or any offer, any proffer. I mean, the record evidence is there. There's nothing from Appellee to show you that any of the record evidence that we put in about Franey is untrue. So it's somewhat frustrating to hear these things when I've got the record citations and they're in our brief on page 15. Well, we can chase down the record cites and see what they say. Okay, thank you. We also provided an affidavit, a Rule 56, as I used to say, but not F anymore, D, affidavit. So in addition, with respect to the 182 reports that they all came from calls from patrons or from appellants themselves, there's no evidence of that. As for it being huge drug buys, as we have on page 10 of our brief, the record citations are there, only nine involved drug buys. The rest were just there. They weren't calls from patrons. They weren't calls. None of that's been substantiated. You have nothing in the record in front of you to substantiate any of that. The reason we took all of those 180 reports and analyzed them in our statement of facts and put record citation numbers next to them is to show you that none of that is correct. None of what is correct? That it's all calls from patrons. It's all drug buys. It's all calls by appellants. Twice, appellants called for police help, and that's documented with the record evidence in our brief as well, on page 10, I believe, of our brief. I'm sorry, page 12 of our brief. What's your best evidence that this was done pursuant to an official policy? The fact that the police, if this were a rogue officer, then they wouldn't have been able to have all of the police department working on it. It's not Franey who does this supposed buy, and I'll get to that in a moment. It's not Franey who himself is doing the drives, the continued intense enforcement. He's been able to get others in the department to do this. No one in the department stops it, not until the lawsuit is filed, and then the lawsuit is filed, and magically somehow it stops, and the policing stops. So that's the part that doesn't make sense. If this were just a rogue officer, if it wasn't a policy or practice that had been going on, it would have not been to the level it had, and it wouldn't involve as many people, and all the LLC officers, the drive-by officers, all of the rest of them. A captain has substantial authority within a department. Did Franey retire? He retired, I believe, just right after we filed the lawsuit, I believe in 2012, so maybe a few months afterward. With respect to the claim that they were treated differently than other establishments, there's nothing in the record to show you that. Mr. Glass don't testify differently and aver differently, that they were treated differently. Ms. Bowling testified that. You don't have any testimony from anyone contradicting that. Mr. Gerling said, I personally may have driven by others as much. I don't know. But you have no department, nothing from the department. One of the things you would think they would produce to you are the records from Cabo Wabo and Slapsticks and everybody saying, see, we went there 180 times. They didn't produce the records. In fact, they refused to do it. They said they weren't relevant. So one of the ways we've established, we've affirmed that these are the facts, you have no evidence from the township to contradict that. That at least produces a factual statement. And I'm out of time. As for not – You are out of time. I know. I can't dispute a confidential informant. Okay, I'm so sorry. We appreciate your argument. Thank you. And we will check the record issues that you all have discussed this morning. Thank you so much. Clerk may call the next case.